*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0241P (6th Cir.)
File Name: 04a0241p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

COMMUNITIES FOR EQUITY,
on behalf of itself, its
members and all those
similarly situated; DIANE
MADSEN, on behalf of her
minor daughters and all those
similarly situated; and JAY
ROBERTS-EVELAND, on behalf
of her minor daughter and all
those similarly situated,
     *Plaintiffs-Appellees,*

     *v.*

MICHIGAN HIGH SCHOOL
ATHLETIC ASSOCIATION, INC.,
on behalf of itself and its
members,
     *Defendant-Appellant.*

> No. 02-1127

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 98-00479—Richard A. Enslen, District Judge.

Argued: June 17, 2004

Decided and Filed: July 27, 2004

Before: KENNEDY and GILMAN, Circuit Judges;
SHADUR, District Judge.[*]

———————

### COUNSEL

**ARGUED:** Edmund J. Sikorski, Jr., Ann Arbor, Michigan, for Appellant. Kristen Galles, EQUITY LEGAL, Alexandria, Virginia, for Appellees. **ON BRIEF:** Edmund J. Sikorski, Jr., Ann Arbor, Michigan, William M. Azkoul, AZKOUL & AZKOUL, Grand Rapids, Michigan, for Appellant. Kristen Galles, EQUITY LEGAL, Alexandria, Virginia, H. Rhett Pinsky, PINSKY, SMITH, FAYETTE & HULSWIT, Grand Rapids, Michigan, Neena K. Chaudhry, Marcia D. Greenberger, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., for Appellees. Teresa Kwong, Dennis J. Dimsey, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

———————

### OPINION

———————

RONALD LEE GILMAN, Circuit Judge. Communities for Equity—an organization of parents and high school athletes that advocates on behalf of Title IX compliance and gender equity in athletics— and the individual plaintiffs (collectively, CFE) brought a class action lawsuit against the Michigan High School Athletic Association (MHSAA), arguing that MHSAA's scheduling of high school sports seasons in

———————

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

Michigan discriminated against female athletes on the basis of gender. The district court concluded that MHSAA's actions violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Educational Amendments of 1972, and Michigan's Elliott-Larsen Civil Rights Act. For the reasons set forth below, we **AFFIRM** the judgment of the district court with regard to the plaintiffs' Equal Protection claim, thus finding no need to reach the Title IX and state-law issues.

## I. BACKGROUND

### A. Factual background

At issue in this case is whether MHSAA's scheduling of athletic seasons and tournaments for six girls' sports—basketball, volleyball, soccer, Lower Peninsula golf, Lower Peninsula swimming and diving, and tennis— violates the law. With the exception of golf, all of these sports are scheduled during the nontraditional season (meaning a season of the year that differs from when the sport is typically played). *Cmtys. for Equity v. Michigan High Sch. Athletic Ass'n.*, 178 F. Supp. 2d 805, 807 (W.D. Mich. 2001). Although Lower Peninsula girls' golf is played in the spring—the traditional season for golf—the fall season, when the boys play, is more advantageous. *Id.* No boys' sports are scheduled in nonadvantageous seasons. *Id.* at 838.

Girls have historically played in the less advantageous seasons because of the way that high school athletics developed in Michigan. MHSAA's executive director, John Roberts, explained in a 1990 article titled *Sports and Their Seasons*, published in MHSAA's Bulletin, that "[b]oys' sports were in [MHSAA member] schools first and girls' sports, which came later, were fitted around the pre-existing boys program." *Id.* at 815.

In its findings of fact, the district court painstakingly discussed each sport at issue and analyzed why play in the nontraditional season (or, in the case of golf, in the traditional season) harmed female athletes. *Id.* at 817-36. Among the harms found by the district court are the following:

[G]irls' basketball [is played] in the fall. Forty-eight states schedule girls' basketball in the winter. . . .

Michigan's female high school basketball players do not get to participate in "March Madness" or the excitement and publicity surrounding this time period when the rest of the country's high schools and colleges are participating in championship basketball tournaments. . . .

Kristi Madsen said that not being able, as a high school basketball player, to participate in the "March Madness" hype made her feel "[a]ngry. I didn't like it. Again, the guys get a ton of special perks or attention because it's 'March Madness' and because they are playing in March, during 'March Madness.'" . . .

Michigan girls have decreased ability to be nationally ranked or obtain All-American honors because they play basketball during the non-traditional fall season. . . .

[I]t is undisputed that if Michigan girls played basketball during the winter season, they would, at the very least, be on 'equal footing' with Michigan boys and with girls in the rest of the country with respect to collegiate recruiting. . . .

In volleyball, the non-traditional season is the disadvantageous season for girls. . . . Michigan high school girls' volleyball is played in the winter season.

The traditional playing season for women's volleyball is the fall. Forty-eight states play high school girls' volleyball in the fall. The NCAA schedules women's volleyball in the fall. Although the MHSAA does not currently sponsor boys' volleyball, the MHSAA's executive staff and volleyball committee have

recommended that once the sport is adopted, it be played in the spring when the NCAA schedules men's volleyball.

College volleyball recruiting focuses on the amateur, private club programs, like those sponsored by an organization called the United States Volleyball Association (USAV), rather than the high school programs . . .

The USAV and AAU, another private club program, seasons for high school age players to play in their amateur programs are from January through June or July. MHSAA rules prohibit athletes from participating in USAV or AAU club volleyball during their December through March high school season.

Michigan girls who participate in high school volleyball are not able to participate in USAV club volleyball until April, after the MHSAA season has ended, while players in other states have been playing club volleyball since January. The MHSAA prohibits students from playing on any team other than a school team during the MHSAA-defined season in that sport. By the end of the MHSAA season, most of the regional and national USAV tournaments have been filled by non-Michigan teams. When there are openings, Michigan club teams are placed "at the very bottom of the tournament where they do not get a chance to compete at the high levels because they haven't been competing . . . ." Michigan club teams have difficulty excelling at these tournaments because they are becoming accustomed to playing with new teammates and a new coach while their competitors have already been playing together for four months. It is therefore more difficult for recruiters to evaluate Michigan players at these tournaments. . . .

[T]he Court finds that the spring season is the inferior season, as compared to fall, for playing soccer in Michigan. . . .

The NCAA schedules women's soccer in the fall. . . .

The MHSAA schedules the boys' soccer state championship tournament in the fall, at the same time that the NCAA schedules men's soccer. . . .

The MHSAA's scheduling of girls' soccer in the spring in Michigan disadvantages girls in several ways. Soccer fields in Michigan are often still frozen or snow-covered when the girls' season starts in the spring, so girls are forced inside for practice and tryouts. Thus, the regular season starts later than scheduled. As a result, Michigan girls must play three games a week over the course of the season to make up postponed games whereas Michigan boys play two games per week over the course of their season.

The increased number of games per week causes a greater risk of injury for girls that Michigan boys do not face. . . .

Girls' opportunities for collegiate recruitment are decreased because college scholarships for soccer are awarded in November and April. Recruiters will not have had an opportunity to see female soccer players in Michigan in their senior year of high school before awarding first-round November scholarships because girls start their competitive season in late March. Michigan boys play during the fall season and are able to have four years of high school competition for college recruiters to consider. . . .

The court finds that in Michigan, fall is the more advantageous season for playing high school golf. . . .

Lower Peninsula girls' golf [is played] in the spring season. . . .

Lower Peninsula boys' golf used to be in the spring, but the MHSAA moved it to the fall season in the 1970s so that boys' golf teams would have better access to golf courses. The MHSAA scheduled Lower Peninsula girls' golf in the spring, which was the season it had previously

determined was less advantageous when it moved boys' golf.

In addition, because the NCAA letter of intent signing date is in early November, Michigan boys have four years of golf experience and scores on which to be evaluated. Michigan girls only have three years because their season occurs after the letter of intent signing date. . . .

The Court finds that the winter season for swimming has advantages that outweigh advantages to swimming in fall. . . .

[T]he Lower Peninsula girls' swimming and diving season [is] in the fall.

[The] Lower Peninsula boys' swimming and diving season [is] in the winter.

[T]he winter season is more advantageous than fall for swimming. For one reason, Michigan boys are able to go straight from the high school swimming season to the club tournaments, whereas Michigan girls have a gap in competition because their season has ended in November. Sectional and regional swim meets for U.S. Swimming take place in March. The Phillips 66 national swim championships are in March/April of each year. In diving, junior nationals are in March, so girls face a gap in competition between the end of their fall interscholastic season and open amateur competition. . . .

[T]he Court finds that spring is the more advantageous playing season for tennis. . . .

[Michigan] girls' tennis [is played] in the fall.

Boys' high school tennis immediately precedes the United States Tennis Association (USTA) summer tennis tournament circuit, so boys have the advantage of high school practice, competition, and coaching before participating in the circuit and are better prepared for the summer circuit, where college coaches watch play. . . .

*Id.* at 817-36.

In addition to sport-specific harms, the district court found that the scheduling of seasons harmed Michigan girls in ways that could be generalized across all sports. For example, "[w]hen girls are treated unequally as compared to boys, girls receive the psychological message that they are 'second-class' or that their athletic role is of less value than that of boys." *Id.* at 837.

The above-quoted findings are only a fraction of the harms that the district court found are experienced by female athletes in Michigan because of MHSAA's scheduling their seasons of play at disadvantageous times. A full recounting takes up 30 pages of the district court's opinion. *Id.* at 809-39.

MHSAA was founded in 1924 "to exercise control over the interscholastic athletic activities of all schools of the state through agreement with the Superintendent of Public Instruction." *Id.* at 810 (quotation marks omitted). MHSAA's Articles of Incorporation further illuminate that the purpose of MHSAA is

to create, establish and provide for, supervise and conduct interscholastic athletic programs throughout the state consistent with [the] educational values of the high school curriculums . . .

*Id.* at 811 (quotation marks omitted). Membership in MHSAA is open to all secondary schools in Michigan. To join MHSAA, a school district's board of education must agree to adopt MHSAA's rules and regulations "as its own and agree[] to primary enforcement of such rules as to its own schools." *Id.* (quotation marks omitted). Over 700 Michigan schools constitute the membership of MHSAA, more than 80% of which are public. *Id.* at 810.

Ticket sales to the state championship tournaments represent 86% of MHSAA's budget. *Id.* at 813. MHSAA member schools remit substantial portions of the gate receipts from their participation in the tournament events to MHSAA. *Id.* Other sources of revenue include tournament concessions, fees from the registration of game officials, advertising in tournament programs, corporate sponsorship, and royalties from television and radio broadcasts of MHSAA tournament events. *Id.*

General control over interscholastic athletic policies is vested in the Representative Council. *Id.* at 812. Nineteen voting members constitute the Council, fourteen of whom are elected by member schools, four of whom are appointed by the Council, and one of whom is a representative of the State Superintendent of Education. *Id.* All members of the Council, with the exception of the representative of the State Superintendent, must be either members of the faculty or board of education of MHSAA-member schools. *Id.* Seventeen of the nineteen members of the Council in 2000-2001 were either employees or representatives of public schools or public school districts. *Id.*

The district court found that high school athletic seasons in Michigan are determined by MHSAA. *Id.* at 814. MHSAA prescribes when practice and competition may start, when competition ends, and the maximum number of games that may be played. Practice outside of the dates set by MHSAA is prohibited. Member schools are not permitted to engage in any competition after the end of the MHSAA season or the end of the state championship tournament in any sport, whichever is last. According to MHSAA rules, athletes may not participate in both interscholastic and amateur club sports in the same sport during the same season. Within the MHSAA-determined seasons, member schools set their own practice schedules and game dates. *Id.*

State championship tournaments are sponsored by MHSAA in twelve boys' sports and twelve girls' sports. *Id.* Only MHSAA-member schools who comply with MHSAA's rules and regulations may participate in these tournaments. *Id.*

## B. Procedural background

In June of 1998, CFE filed the present lawsuit, alleging that MHSAA discriminated against female athletes. The district court denied two successive motions for summary judgment filed by MHSAA. MHSAA then filed a motion to dismiss, which was granted in part, dismissing all of CFE's disparate-impact claims.

From September 24 through October 4, 2001, the district court conducted a bench trial on the remaining claims. The court handed down its decision on December 17, 2001, holding that MHSAA's scheduling of female sports seasons violated the Equal Protection Clause of the Fourteenth Amendment, Title IX (20 U.S.C. §§ 1681-1688), and Michigan's Elliott-Larsen Civil Rights Act (Mich. Comp. Laws Ann. §§ 37.2101-37.2804). *Cmtys. for Equity*, 178 F. Supp. 2d at 862.

As part of its ruling, the district court enjoined MHSAA from continuing its current scheduling of interscholastic athletics seasons in Michigan. The court retained jurisdiction over the case, ordering MHSAA to submit a Compliance Plan so that an appropriate remedy could be implemented. *Id.* MHSAA's initial Compliance Plan was rejected by the court, but a revised plan was filed by MHSAA in October of 2002 and subsequently approved.

## II. ANALYSIS

### A. Standard of review

Questions of constitutional interpretation are issues of law, which we review de novo. *Ammex, Inc. v. United States*, 367 F.3d 530, 533 (6th Cir. 2004). The district court's findings of fact, on the other hand, will not be set aside unless they are determined to be clearly erroneous. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003).

### B. Equal Protection

#### 1. State action

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Pursuant to 42 U.S.C. § 1983,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

An entity or individual charged under § 1983 with a Fourteenth Amendment violation must be a "state actor." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1111 (6th Cir. 1995) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state

actor intentionally discriminated against the plaintiff because of membership in a protected class.") (quotation marks and citation omitted). As a threshold issue, therefore, we must determine whether MHSAA is a state actor.

In determining that MHSAA is a state actor, the district court relied upon the United States Supreme Court's decision in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). *Cmtys. for Equity*, 178 F. Supp. 2d at 846-848. The *Brentwood Academy* case addressed the issue of whether the Tennessee Secondary School Athletic Association (TSSAA), which was "incorporated to regulate interscholastic athletic competition among public and private secondary schools," engaged in state action when it enforced one of its rules against a member school. *Id.* at 290. Because of "the pervasive entwinement of state school officials in the structure of the association," the Court held that TSSAA's regulatory activity constituted state action. *Id.* at 291. The Court acknowledged that the analysis of whether state action existed was a "necessarily fact-bound inquiry," *id.* at 298 (quotation marks omitted), and noted that state action may be found only where there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 295 (quotation marks omitted).

Public schools constituted 84% of TSSAA's membership, the Court noted, and school faculty and administrators provided TSSAA's leadership. *Id.* at 298. The Court was also influenced by the fact that TSSAA's primary revenue source was gate receipts from tournaments between TSSAA-member schools. *Id.* at 299. In conclusion, the Court stated that,

> to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling. There would be no recognizable Association, legal or tangible,

without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms.

*Id.* at 299-300. The Court also found significant that TSSAA ministerial employees were treated like state employees by virtue of their eligibility for membership in the state retirement system. *Id.* at 300.

MHSAA's stated purpose, "[t]o create, establish and provide for, supervise and conduct interscholastic athletic programs throughout the state," is virtually identical to that of its Tennessee counterpart. *See id.* at 290. Like TSSAA, MHSAA's membership is composed primarily of public schools. And, similar to TSSAA, public school teachers, administrators, and officials dominate MHSAA's leadership. Another common feature is that the bulk of MHSAA's revenue comes from ticket sales for state championship tournaments. Finally, MHSAA employees who had state teaching certificates were, until January of 1988, considered state employees and were therefore eligible to participate in the state's retirement system. Employees who started working for MHSAA before January of 1988 continue to be members of the state employees' retirement system. *Cmtys. for Equity*, 178 F. Supp. 2d at 813.

We therefore conclude that MHSAA is so entwined with the public schools and the state of Michigan, and that there is "such a close nexus between the State and the challenged action," *Brentwood Academy*, 531 U.S. at 295 (quotation marks omitted), that MHSAA should be considered a state actor. Tellingly, MHSAA argued earlier in this litigation, before the Supreme Court reversed this court's opinion in *Brentwood Academy*, 180 F.3d 758 (6th Cir. 1999), that "the nature and function of the MHSAA is virtually identical to that of the TSSAA." *Cmtys. for Equity,* 178 F. Supp. 2d at 847. MHSAA, in sum, has failed to present any compelling

argument to distinguish itself from TSSAA. We therefore affirm the determination of the district court that MHSAA is a state actor.

### *2. Denial of Equal Protection*

The Supreme Court has held that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996) (dealing with the admission of women to the Virginia Military Institute, hereafter referred to as *VMI*). In *VMI*, the Court further explained the State's burden under the heightened standard for gender-based classifications:

> To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*Id.* at 532-33 (quotation marks and citations omitted).

The district court analyzed the scheduling of the Michigan athletic seasons under *VMI*'s standard, determining that MHSAA had to show that scheduling team sports in different seasons based on gender "serves important governmental objectives and that this scheduling is substantially related to

the achievement of those objectives." *Cmtys. for Equity*, 178 F.Supp.2d at 850. In addition, the district court noted that MHSAA's justifications must be "exceedingly persuasive." *Id.* (quotation marks omitted). MHSAA asserted that the scheduling decisions were designed to maximize girls' and boys' participation in athletics, arguing that the scheduling system maximizes opportunities for participation "by creating optimal use of existing facilities, officials and coaches, thereby permitting more teams in a sport or more spots on a team." *Id.*

Conceding that MHSAA's logistical concerns were important, the district court concluded that MHSAA had failed to demonstrate, pursuant to the standards set forth in *VMI*, that discriminatory scheduling was "'substantially related' to the achievement of those asserted objectives." *Id.* at 850-51. MHSAA's reliance upon anecdotal and "weak circumstantial" evidence was found insufficient to carry its burden. The district court also pointed out that *even if* MHSAA had sufficiently proven the point about athletic-participation opportunities, "that would not justify forcing girls to bear all of the disadvantageous playing seasons alone to solve the logistical problems." *Id.* at 851.

On appeal, MHSAA reiterates its argument made below that the purpose of separate athletic seasons for boys and girls is to maximize opportunities for athletic participation. MHSAA asserts that statistics showing that Michigan has a higher number of female participants in high school athletics than most states satisfies the requirements of *VMI*. An "unavoidable consequence of separate teams," according to MHSAA, "was accommodation of twice the number of teams, games and participants."

The evidence offered by MHSAA, however, does not establish that separate seasons for boys and girls—let alone scheduling that results in the girls bearing all of the burden of playing during disadvantageous seasons—maximizes

opportunities for participation. MHSAA argues that bare participation statistics "*are the link* showing that separate seasons are substantially related to maximum participation." (Emphasis added.) But a large gross participation number alone does not demonstrate that discriminatory scheduling of boys' and girls' athletic seasons is substantially related to the achievement of important government objectives.

MHSAA also contends that it cannot be liable under the Equal Protection Clause because there is no evidence that MHSAA acted with discriminatory intent. It points out that "[t]here is no evidence that MHSAA [] scheduled [] sports seasons because of 'sexual stereotypes' or as a result of any discriminatory purpose or intent." This argument appears to confuse intentional discrimination—i.e., an intent to treat two groups differently—with an intent to harm. As stated above, Equal Protection analysis requires MHSAA to show that its disparate treatment of boys and girls "serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *VMI*, 518 U.S. at 533.

Disparate treatment based upon facially gender-based classifications evidences an intent to treat the two groups differently. *VMI* imposes no requirement upon CFE to show that an evil, discriminatory motive animated MHSAA's scheduling of different athletic seasons for boys and girls. The cases that MHSAA cites to the contrary, such as *Hernandez v. New York*, 500 U.S. 352 (1991), are inapposite because they involve facially neutral classifications, rather than facially gender-based classifications. In *Hernandez*, for example, the Court analyzed a racially-neutral explanation for a prosecutor's exercise of peremptory strikes in picking a jury, noting that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360. The facts of the present case are quite different from those of *Hernandez*.

In sum, we do not find that MHSAA's justification for its scheduling practices is "exceedingly persuasive" in meeting the heightened standard required by *VMI* for the gender-based classifications. *See VMI*, 518 U.S. at 532-33. We therefore affirm the district court's grant of relief to CFE on the Equal Protection claim.

## C. Compliance Plan

Upon finding that MHSAA's scheduling of high school athletic seasons violated the Equal Protection Clause of the Fourteenth Amendment, Title IX, and Michigan's Elliott-Larsen Civil Rights Act, the district court ordered MHSAA to "bring its scheduling of the seasons of high school sports into compliance with the law by the 2003-2004 school year." *Cmtys. for Equity*, 178 F. Supp. 2d at 862. MHSAA was required to submit a Compliance Plan to the court by June 24, 2002. *Id*.

After MHSAA filed its proposed Compliance Plan, CFE and the Department of Justice filed responses, arguing that MHSAA's plan failed to remedy the inequities that existed in the scheduling of Michigan's high school athletics seasons. The Department of Justice noted that "the proposed Compliance Plan would perpetuate sex discrimination by requiring more than three times as many girls as boys to play in disadvantageous seasons and by addressing only sports, with the exception of boys' golf, offered by less than half of MHSAA's member schools."

In August of 2002, the district court rejected MHSAA's proposed plan as not achieving equality. The court offered MHSAA three options:

(1) combine all sports seasons so both sexes' teams play in the same season . . . and move girls' volleyball to its advantageous season of fall; or (2) reverse girls' basketball and volleyball; and in the Lower Peninsula,

reverse two girls' seasons with two boys' seasons from among golf, tennis, swimming, and soccer; and in the Upper Peninsula, keep combined seasons in golf and swimming and reverse seasons in either tennis or soccer; or otherwise treat the Upper Peninsula the same as the Lower Peninsula; or (3) reverse girls' basketball and volleyball; and in both peninsulas, combine seasons in two sports, and reverse seasons in one of the two remaining sports at issue.

MHSAA selected the second option in the amended Compliance Plan that it filed with the district court in October of 2002. The amended plan was approved by the court the following month.

MHSAA contends that the district court erred in rejecting MHSAA's initial Compliance Plan. Before we can address the merits of this argument, however, we must determine whether appellate jurisdiction exists to hear the issue.

CFE argues that MHSAA failed to appeal the Compliance Plan order, pointing out that MHSAA's January 2002 Notice of Appeal references only the opinion, judgment, and injunctive order entered in December of 2001. MHSAA did not file an amended Notice of Appeal following the district court's rejection of its initial Compliance Plan in August of 2002.

The appellate courts lack jurisdiction over issues that are the subject of post-judgment motions, such as a motion for a new trial, when arguments in those motions are not included in a Notice of Appeal. In *United States v. Warner*, 10 F.3d 1236 (6th Cir. 1993), for example, this court held that "by being a distinct appealable order from which a separate appeal must be taken," a denial of a motion for new trial

is subject to the requirement that the appeal be taken within ten days from the docketing of the district court's

order. Absent an appeal within this time, or an extension from the district court for filing the notice of appeal, this court, being without authority to extend the time for filing a notice of appeal, will lack the jurisdiction to hear the appeal.

*Id.* at 1240.

MHSAA did not file an amended Notice of Appeal following the district court's rejection of the initial Compliance Plan. We therefore conclude that this court lacks jurisdiction to consider MHSAA's argument concerning the rejection.

### D. Judge Enslen's refusal to recuse himself

The final issue raised by MHSAA relates to the involvement of the district judge in the present case, Judge Enslen, in a case filed by MHSAA over twenty years ago. In 1983, MHSAA filed suit in the Western District of Michigan against the United States Department of Education and the Office of Civil Rights in the case of *Michigan High School Athletic Association v. Bell*, No. 83-CV-6250-AA. Judge Enslen recused himself from the 1983 case for reasons that no one, including Judge Enslen, can presently recall. MHSAA nevertheless argues that because Judge Enslen recused himself then, he should have recused himself now.

The record before us does not explain why Judge Enslen recused himself from the 1983 case, but, in denying MHSAA's motion for disqualification, Judge Enslen stated that he could think of no reason why he would be unable to remain impartial. Judge Enslen also noted that "only one of the 21 Defendants in the current case was a party to the 1983 case, and none of the class Plaintiffs in the current case was involved in the 1983 case." Because MHSAA failed to provide any valid basis for Judge Enslen's recusal, we affirm the ruling of the district court in denying MHSAA's motion.

*See Person v. General Motors Corp.*, 730 F. Supp. 516, 518-19 (W.D.N.Y. 1990) (stating that recusal in a prior case involving a party is not alone sufficient for disqualification in a later case involving that same party).

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court on the basis that MHSAA's actions regarding the scheduling of girls' sports seasons in Michigan violated the Equal Protection Clause of the Fourteenth Amendment.